# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 18-650

**STATE OF LOUISIANA**

**VERSUS**

**STEPHAN TYLER BRAGG**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-FIFTH JUDICIAL DISTRICT COURT
PARISH OF GRANT, NO. 2016-759
HONORABLE WARREN D. WILLETT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**SHANNON J. GREMILLION**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Shannon J. Gremillion, and Van H. Kyzar, Judges.

**CONVICTIONS AND SENTENCES AFFIRMED.**

**Justin C. Harrell**
**Attorney At Law**
**1100 Poydras Street, Suite 2900**
**New Orleans, LA 70163**
**(504) 585-7329**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Stephan Tyler Bragg**

**James P. Lemoine**
**District Attorney**
**Thirty-Fifth Judicial District Court**
**Renee W. Nugent**
**Assistant District Attorney**
**P. O. Box 309**
**Colfax, LA 71417**
**(318) 627-2971**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**GREMILLION, Judge.**

On August 12, 2016, Defendant, Stephan Tyler Bragg, was charged by bill of information with ten counts of sexual battery, in violation of La.R.S. 14:43.1. The ten counts were alleged to have occurred between October 25, 2014, and June 9, 2016, and all concerned a juvenile victim, K.R.D. (DOB: 10/25/2005).[1]

On April 26, 2018, a 10-2 jury found Defendant guilty of five counts of sexual battery and not guilty of the remaining five counts. On May 24, 2018, the trial court sentenced Defendant to forty-five years imprisonment at hard labor with the first twenty-five years to be served without benefits on each count and ordered the sentences to run concurrently. Although defense counsel objected to the introduction of a district attorney's file related to Defendant's prior conviction for carnal knowledge of a juvenile, no objection was made as to the actual sentence, nor was a motion to reconsider sentence ever filed.

Defendant now appeals his convictions and sentences, raising three assignments of error: (1) there is insufficient evidence to support his convictions; (2) his rights were violated by the trial court allowing Jada Bragg, the victim's cousin, to testify under La.Code Evid. art. 801(D)(1)(d) as a first reporter; and (3) his rights were violated when the State introduced into the record evidence related to his prior conviction for carnal knowledge of a juvenile during sentencing. For the following reasons, Defendant's convictions and sentences are affirmed.

### FACTS

The State's first witness was Captain James Watkins of the Grant Parish Sheriff's Office. Captain Watkins testified that he was promoted from Detective to Captain in February of 2017. He noted that, as a detective, his job included

---

[1]Pursuant to La.R.S. 46:1844(W), the victim will be referred to by her initials throughout given that she is both a juvenile and the victim of a sex offense.

investigating everything from petty theft to murder. Captain Watkins also testified there was no special unit in Grant Parish for addressing sex crimes. Captain Watkins testified that he was involved in the investigation of Defendant, and said he has worked on roughly thirty sex-offense cases. Captain Watkins stated the investigation into Defendant began when Katie Devine and William Bragg, the victim's parents, brought her into the station on June 10, 2016.

Captain Watkins described the sheriff's process for investigation of juvenile sex offenses, noting they immediately remove the juvenile from the room and ask the parents not to question the child about the incident to avoid influencing the child's answers when they are questioned by someone at the Rapides Advocacy Center. Captain Watkins testified that he was in an adjacent room with the ability to speak to the interviewer during the victim's recorded interview, but that only the forensic interviewer was in the room with the victim. After the victim disclosed that she was abused by Defendant, her uncle, Captain Watkins obtained an arrest warrant.

Captain Watkins acknowledged that he did not schedule a medical exam of the victim, noting that in his experience, a medical exam would not have been helpful since the allegations involved "using the digits." Captain Watkins noted the victim stated there had been three to four months between the last time she was abused and when it was reported because "[s]he was scared to tell anybody what was going on so nobody knew um, she would just tell her parents that she did not want to go over there, and they didn't think nothing of it, and they continued to bring her over there." It was noted that Defendant is the brother of the victim's father.

On cross-examination, Captain Watkins stated that in June 2016, there were four detectives at the Grant Parish Sheriff's Office. Captain Watkins acknowledged he had not had any special training regarding sex offenses since his time at the police academy. He further noted that during the victim's interview at the advocacy center,

the only people able to monitor the interview would be the detective investigating the case and a representative from the Department of Child and Family Services, if they had become involved. Captain Watkins acknowledged the victim told the interviewer that Defendant had, on multiple occasions, penetrated her vagina digitally and that it hurt badly every time he did so. Captain Watkins again admitted that he made the decision not to seek a medical examination in the case. When asked if he was familiar with what a hymen was or how a doctor would conduct a physical exam, Captain Watkins stated, "I am not a doctor." Captain Watkins also verified that he did not speak with Dominique Bragg or Donna Tyler, Defendant's wife and mother-in-law, as their names were not mentioned by the victim during her interview.

On re-direct, Captain Watkins noted one of the reasons he did not have a vaginal examination done was because it was unlikely there would be evidence present, given the victim said it had been months since the last time Defendant had touched her. He also stated that neither Defendant's wife nor mother-in-law have attempted to speak with him since Defendant was arrested.

The State's next witness was the victim's first cousin, Jada Bragg, who testified that she was sixteen-years old and in the tenth grade. She stated that Defendant was her uncle, her mother's brother, and that she called him Tyler. Jada testified that she is three years older than K.R.D. and is like a big sister to K.R.D. She testified that one night, K.R.D. spent the night with Jada and her mother after they had all been at Defendant's house earlier in the day. Jada noted that Defendant, his wife Dominique, their daughter Layla, and Dominique's mother lived in the house. She testified they had been at Defendant's home for no more than three hours. Jada noted that while she and Layla, who was only about two or three years old, did

not have a great relationship, Layla and K.R.D. were very close and Layla would always cry when K.R.D. left.

Jada testified that Layla wanted K.R.D. to spend the night, which was normal, but K.R.D. did not want to stay, whereas she normally would spend the night. Jada stated that when she asked K.R.D. why she did not want to stay with Layla, K.R.D. initially would not give her a reason but then started crying. Jada testified that, after a couple of tries, K.R.D. managed to tell her she did not want to stay because Defendant would touch her and it hurt, eventually telling Jada that he would touch her "lower region." Jada asked why K.R.D. had not told her before, and K.R.D. told her that she did not want "Layla to have a broken up family." Jada stated that K.R.D. did not want her to tell anyone, but that after about an hour she was having a panic attack and told her mother, who then told K.R.D.'s mother, Katie. Jada noted that knowing what K.R.D. was going through made her sad, stated everything she had said was the truth, and no one had spoken to her about what to say at trial.

Jada testified that she told her mother what K.R.D. had told her initially and that her mother told K.R.D.'s mother. She seemed very unsure of whether she had ever spoke to Captain Watkins or when and where any conversation with him took place. She acknowledged that Defendant's home had wood floors but was unsure if the house was on a slab or if it was elevated off the ground. She restated that she thought it was weird that K.R.D. did not want to stay at Defendant's with Layla the way she normally did, which led to K.R.D. telling Jada about Defendant touching her.

The State's next witness was Ms. Shelly Bell, a Christus Health employee previously employed by the Rapides Children's Advocacy Center. Ms. Bell noted she had a Bachelors' degree in Family and Child Studies from Louisiana Tech, a week of intensive training on being a forensic interviewer, then continuing training

and education while working for the advocacy center. She noted that as a forensic interviewer, her goal was "just to hopefully not traumatize [the children] more." She testified she interviewed K.R.D. on June 13, 2016, at the advocacy center office in Alexandria. Ms. Bell stated that once the interview began, it was her interview, so while a detective might have questions or concerns about certain facts, they did not tell her explicitly what to ask.

Ms. Bell testified that immediately after an interview, she would stop the recording and make a DVD for the detective to keep for their file. She also stated that if requested, another member of the office would transcribe the video, then she would review it and deliver it to the detective. Ms. Bell testified at the end of her interview with K.R.D., she utilized an anatomical drawing to verify what part of the body K.R.D. was discussing, giving the following reasoning:

> Throughout the interview um, she was very reluctant to - - to refer to a certain name for any body part. Um, and so in that case, it was either just a gesture or down there, or where I use the restroom, so just for clarification, to make sure there were no assumption[s] whatsoever, I went and got the drawing and had her circle the body part on her body that she was talking about.

Ms. Bell stated she believed K.R.D. was nine at the time of the interview. The State then played the video of K.R.D.'s interview with Ms. Bell while distributing a copy of the transcript of the interview to each member of the jury.

*K.R.D.'s Interview at Rapides Children's Advocacy Center*

After describing the layout of the room, Ms. Bell discussed art with K.R.D. K.R.D. stated that she had an eleven-year-old brother and a five-year-old sister. She told Ms. Bell she went back and forth between her mother and father, who do not live together, but do live in the same town. K.R.D. stated she was ten years old. She described the living arrangements at both her mother's and her father's homes.

5

K.R.D. then noted that she "used to go to [her] uncle's." She noted her uncle's name is Stephan, but they call him Tyler.

K.R.D. told Ms. Bell that her uncle, Defendant, would touch her "[w]hen [she] was sleeping and sometimes it woke [her] up." She also stated that "it hurt very badly." She stated Defendant touched her more than once and that it would happen when she and her brother spent the night at Defendant's house. K.R.D. stated that typically, she and her brother would sleep on a pull-out sofa, but that Defendant would often make her sleep with her two-year old cousin, Layla, whose bed was directly next to Defendant's side of his bed. She could not remember the first time Defendant had touched her, but she described an instance where she and her brother were asleep on the sofa bed and Defendant came in and woke her up by touching her. Although she said there were no lights on when it happened, she knew it was Defendant "[b]ecause [she] could see him." She stated she told him to quit, but he pretended he was sleeping. She would not name the part of her body that he was touching but stated it "hurt down there" and noted she uses that part of her body "[t]o use the restroom."

K.R.D. told Ms. Bell that Defendant was touching her with his hand and fingers underneath her clothes, noting he would sometimes put his fingers inside her and move them. She noted that whenever she would tell him to stop, he would pretend to be asleep, but she remembered one occasion where Defendant asked her "if it felt good" when she woke up and she told him "no, it hurts badly." She stated she would tell her parents she did not want to go to Defendant's house, but they would send her so they could go to work and she "didn't want to tell them because [she] was scared." K.R.D. stated all of the occasions when Defendant would touch her happened at night.

6

When asked if she had ever spoken to anyone about what happened, the only person K.R.D. mentioned was Jada, noting "how they found out was I told my cousin." Additionally, when Ms. Bell asked K.R.D. directly "[h]ave you talked with anyone else about what all has gone on with Tyler[,]" K.R.D. gave a negative answer. She told Ms. Bell it had happened "[a]t least 10 or 12 times," noting Defendant had built a new house about a year before, and Defendant's touching her only happened in the new house. K.R.D. then indicated on an anatomical drawing, introduced as State's Exhibit 2, that Defendant had been touching her on and inside her vagina. K.R.D. and Ms. Bell then discussed 4-H camp before ending the interview.

On cross-examination, Ms. Bell noted that she worked on a number of sexual abuse cases in the three-and-a-half years she was with the Rapides Children's Advocacy Center. When pressed on whether it is normal to not have a SANE (Sexual Assault Nurse Examiner) examination done in a case where there is an accusation of digital penetration, Ms. Bell responded "yes, there is sometimes [sic] where there's an exam done, and there's sometimes [sic] where there is not an exam done." Ms. Bell did not recall whether she ever spoke to Captain Watkins about having a physical examination done on K.R.D.

The State then called the victim, K.R.D., who testified that her birthday is October 25, and she would be thirteen on October 25, 2018. K.R.D. repeated that she promised to tell the truth in court and acknowledged no one had told her what to say in court. K.R.D. testified that she is currently living with someone named Alicia, K.R.D.'s siblings, and Alicia's three children. She stated Alicia's children were seventeen, fifteen, and thirteen, while K.R.D.'s brother Jamison was almost fourteen and her younger sister was six. K.R.D. testified that she and Jada share secrets and tell each other about things that happen to them.

K.R.D. stated she had not seen Defendant in about two years but noted that when she visited him, he lived with his wife Dominique, his mother-in-law Donna, and his daughter Layla. K.R.D. stated she was sad because she had not seen Layla in nearly two years and that they were close then, noting she would watch Layla with supervision and saw her frequently. K.R.D. recounted Layla had a bedroom, Donna had a bedroom, and Defendant and Dominique had a bedroom, but Layla slept in a "crib bed" in her parents' room. She described the bed as "one side was opened and the other had like a gate thing." K.R.D. recalled that her older brother would stay at Defendant's house with her and that they would sleep on the couch, except when Layla wanted to sleep with K.R.D.; then K.R.D. and Layla would sleep in Layla's bed in Defendant's bedroom. K.R.D. testified Layla would sleep against the closed side of the bed and K.R.D. would sleep on the open side, noting she was able to fit because she wasn't very tall.

She recalled going to the advocacy center a few days after she told Jada what had happened to her. She also recalled truthfully telling Jada that Defendant had done things to her and hurt her, but she could not remember the exact words she had used when speaking to Jada. She testified that Defendant would touch her on her "private parts," noting she meant the same location she had indicated on the anatomical drawing during her interview. K.R.D. stated Defendant would touch her with his hands and wake her up sometimes, clarifying that she believed he may have touched her other times when she did not wake up. She testified that she could not really see anything when she would wake up, and she could not really explain how, but she knew it was Defendant touching her with his hands.

K.R.D. testified the open part of Layla's bed, where she would sleep, was right up against Defendant's side of the bed he shared with his wife. She stated that when she would move away from him, he would typically stop touching her. Because of

8

the location of Layla's bed, Defendant did not have to get out of bed in order to touch her. She testified she woke up to Defendant touching her "[m]ore than like five (5)" times. She knew it was Defendant touching her because he was moving his hand and she could see him in the bed next to her, and there was no one else close to her but Layla, who was asleep.

K.R.D. also related that on one occasion, she was sleeping on the pull-out part of the sofa with Layla and Defendant had laid down with them because he did not want Layla sleeping by herself. Defendant had again been touching her and asked her either if she liked it or if it felt good, and she told him that it hurt. She noted she was afraid to tell anyone what was happening because she was afraid no one would believe her. Although she would sometimes say she did not want to go to Defendant's house, she was afraid of saying the reason. She testified that she knew Defendant had not touched her in his old house, so she was at least nine when he started touching her, and she was ten when she told Jada. K.R.D. testified the last time Defendant touched her was a "couple of weeks" before she told Jada.

In accordance with Jada's testimony, K.R.D. recalled having cake at Defendant's house earlier in the day before telling Jada what had happened when they were alone later that night. She stated Jada then told her mother, who in turn called and told K.R.D.'s mother. She recalled Jada crying when K.R.D. told her what happened and insisting they should tell someone, but K.R.D. did not want to tell anyone because she did not know what to do. She noted that she asked Jada not to tell anyone.

On cross-examination, K.R.D. stated that Defendant's house had wood floors. She also testified that the pull-out sofa she and her brother usually slept on was in the living room. She testified that Defendant's fingers were inside of her some of the times. She knew that Defendant had touched her at least five times because that

9

was how many times she woke up while he was touching her. She also stated she believed it had been more than a few weeks, closer to months, between the last time Defendant touched her and when she told Jada. She noted that she never had any bleeding as a result of Defendant touching her. After stipulating that K.R.D. is not Defendant's spouse, the State rested.

Defendant's first witness was his mother-in-law, Donna Tyler. She testified that she's been living with Defendant and his wife since 2014 and was living with them at the time of the events in question. Ms. Tyler testified that she began living with Defendant and his wife around the time they moved into their home, which was a remodeled house raised on piers. She testified that she had her own bedroom in the house. She stated the floors of the home were wood throughout the house. She confirmed that when Layla was little, she slept in a baby bed in the master bedroom next to Defendant's side of the bed against the wall.

Ms. Tyler testified that whenever K.R.D. would spend the night, her brother was always with her and they would sleep on the couch. She stated she never saw either of the kids sleep in the room with Defendant and his wife and that she would often stay up late with the kids watching TV. Ms. Tyler testified that she was a light sleeper who goes to bed late and would have heard if Defendant was walking around the house, because the floors and doors squeak. She also stated that she slept with her bedroom door open.

Defendant then called his wife, Dominique Laray Bragg, to the stand. Mrs. Bragg stated that the home she and Defendant shared was an older three-bedroom, two-bath house on stilts, remodeled in 2014. Mrs. Bragg stated Layla's bed was against the wall, not the bed, and that there was a bed rail on the side of it. She also noted the entire house had hard wood floors. Like Ms. Tyler, Mrs. Bragg testified that K.R.D. always slept in the living room with her brother on the pull-out sofa,

never in the room with the Braggs. Mrs. Bragg also testified that she was a light sleeper and that Defendant would not have been able to get out of bed without her knowing it. Defense counsel then rested.

## ASSIGNMENT OF ERROR NUMBER ONE

In his first assignment of error, Defendant argues the verdict "is contrary to the evidence." Defendant cites *State v. Marshall*, 04-3139, p. 9 (La. 11/29/06), 943 So.2d 362, 369, *cert. denied*, 552 U.S. 905, 128 S.Ct. 239 (2007), to argue the victim's identification of Defendant as her abuser is not free from "internal contradiction or irreconcilable conflict with the physical evidence" and thus cannot be the basis for his conviction.

The analysis for a sufficiency claim is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Sexual battery is relevantly defined in La.R.S. 14:43.1(A) as:

> [T]he intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender, directly or through clothing, or the touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim, directly or through clothing, when any of the following occur:

11

. . . .

(2) The victim has not yet attained fifteen years of age and is at least three years younger than the offender.

As noted by the fourth circuit in *State v. Simmons*, 621 So.2d 1135, 1138 (La.App. 4 Cir. 1993), *amended on rehearing*, sexual battery "prohibits the touching of the anus or genitals of the victim where he or she has not yet attained fifteen years of age, when the offender is more than three years older than the victim." In the instant case, the attorneys stipulated Defendant's date of birth is October 25, 1987, and K.R.D.'s date of birth is October 25, 2005. As the touching was alleged to have happened between October 25, 2014, and June 9, 2016, there is no question the State proved K.R.D. was less than fifteen years old and Defendant is more than three years older than her. Defendant's argument is, essentially, that K.R.D.'s testimony is not credible, as evidenced by his statement that "[n]ot only is there something in the boldness of this accusation that belies belief, but it is simply irrational to believe that the abuse was consummated without waking the others."

Defendant's entire argument appears to be premised on disbelieving anything K.R.D. said, at trial or in her child advocacy interview. He focuses on the claims by his wife and mother-in-law that they are light sleepers and would have heard him walking around the house. However, K.R.D. specifically testified the touching typically occurred while Defendant was lying in his bed within arms-reach of K.R.D. when she was sleeping with Layla next to Defendant's side of the bed. On the one occasion where she stated Defendant touched her on the couch in the living room, she testified he had been on the couch with her and Layla when she went to sleep. Accordingly, as noted by the State in its brief, Defendant's claim that people in the house would have heard him moving around is nothing more than a red herring,

given that K.R.D. always placed Defendant in a position where he would not have to move at all in order to touch her.

Defendant attacks the quality of the investigation by Captain Watkins because no physical examination was conducted to obtain physical evidence. As noted above, Captain Watkins stated he opted not to have an exam done for multiple reasons, chief amongst them being the fact that K.R.D. said the touching had not happened for weeks before she reported to Jada. Furthermore, given K.R.D.'s statements that Defendant touched her vagina with his fingers and her statement that she had never bled after Defendant touched her, we are unclear on what physical evidence Defendant believes would have been found if an exam had been performed months after the last instance of abuse.

Finally, Defendant offers no examples of "internal contradiction" such that K.R.D.'s testimony should be discredited. *Marshall*, 943 So.2d at 369. He simply attacks her identification of Defendant as her abuser because of her statements that she "didn't really see anything" and that she did not "really know how to explain" it was Defendant touching her with his hands. K.R.D. specifically stated in her child advocacy interview that sometimes she could see Defendant's hand moving and that on one occasion he specifically asked her if it "felt good." Furthermore, all of the instances described by K.R.D. involved circumstances where the only two people who could be touching her were Defendant and his two-year-old daughter. To suggest K.R.D. could not tell the difference between being touched by a thirty-year-old man or a two-year-old child is a suggestion that is anathema to common sense. As Defendant himself complained about a lack of physical evidence, there is no such evidence to contradict K.R.D.'s testimony.

At the end of the trial, the jury found K.R.D.'s testimony to be credible. Viewing the evidence in the light most favorable to the prosecution, as required by

*Jackson*, 433 U.S. 307, a rational juror could have found Defendant guilty beyond a reasonable doubt. Accordingly, this assignment of error lacks merit.

## ASSIGNMENT OF ERROR NUMBER TWO

In his second assignment of error, Defendant argues the trial court improperly allowed Jada Bragg to testify to hearsay as the first person to whom K.R.D. reported her abuse. Although Defendant acknowledges that La.Code Evid. art. 801(D)(1)(d) specifically allows prior statements of a witness to be allowed into evidence as non-hearsay where the statements are consistent with the testimony of the witness who has testified at trial when the statements are of an initial report of sexual abuse, he contends the State failed to prove Jada Bragg was the first person to whom K.R.D. reported. Defendant's argument can be summarized in his conclusory statement that:

> It is not merely plausible that KRD confided to someone else prior to disclosing to Jada, it is highly likely. After all, it should be recalled that KRD divulged her "secret" to Jada under almost casual questioning from the latter regarding the accuser's disinterest in staying at the Bragg home.

Initially, we note that under La.Code Crim.P. art. 841(A):

> An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.

Not only did defense counsel fail to object to Jada Bragg's testimony, defense counsel, in objecting to Jada stating what K.R.D.'s mom had said, specifically acknowledged that Jada "certainly can testify about anything the alleged victim uh, told her, thank you." Furthermore, even if defense counsel had objected to Jada's testimony, Defendant's claim that no one ever asked if Jada was the first person K.R.D. told is factually incorrect, as is his assertion that the "State assiduously

14

avoids asking K.R.D. whether she told anyone prior to Jada." During K.R.D.'s interview at the child advocacy center, Ms. Bell specifically asked her, aside from Jada and subsequently Jada's and K.R.D.'s mothers, had she ever "talked with anyone else about what all has gone on with Tyler," to which K.R.D. replied negatively. Because defense counsel failed to object at trial and Defendant's argument is premised on a factual inaccuracy, this assignment of error lacks merit.

### ASSIGNMENT OF ERROR NUMBER THREE

In his third and final assignment of error, Defendant argues his sentence should be vacated because the trial court "erred in considering unadjudicated facts at sentencing." In essence, Defendant's argument complains that it was improper for the State to offer evidence of the underlying facts of Defendant's prior conviction for carnal knowledge of a juvenile, and the trial court erred in overruling defense counsel's objection to said underlying facts. In particular, the State suggested to the trial court that it should consider that the plea deal resulting in a carnal knowledge of a juvenile conviction was actually an aggravated rape of a three-year-old relative.

Initially, we note that while defense counsel did object to the introduction of parts of the district attorney's file in connection to his prior conviction, the basis of that objection was that counsel considered witness statements to be hearsay that deprived Defendant of his right to cross-examine the witnesses. Because Defendant has raised new grounds for objecting to the introduction of the district attorney's file connected to his prior conviction, this court may find Defendant waived his current argument under La.Code Crim.P. art. 841(A), as noted above, by not basing his objection on the grounds now argued. Nevertheless, we will allow Defendant to contest the introduction of information related to his prior conviction, the merits of which are discussed below.

15

Defendant's argument relies heavily on the Supreme Court's ruling in *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 2362-63 (2000), wherein the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Defendant also relies on the Court's subsequent clarification in *Blakely v. Washington*, 542 U.S. 296, 303, 124 S.Ct. 2531, 2537 (2004), that "[o]ur precedents make clear, however, that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" Neither case is applicable to Defendant's claim.

In *Apprendi*, the defendant pled guilty to a crime with a sentencing range of five to ten years but which featured a hate crime enhancement, which could be applied based upon a finding by a preponderance of the evidence by the trial court. Following the defendant's guilty plea, the State sought enhancement and the trial court sentenced the defendant to twelve years imprisonment. The Court held that enhancement violated the defendant's rights because it allowed an increased sentencing range without consideration by the factfinder and required less than proof beyond a reasonable doubt. Likewise, *Blakely* involved a defendant who pled guilty to crimes wherein the allowed sentencing range was forty-nine to fifty-three months imprisonment but where the trial court sentenced the defendant to 90 months imprisonment based on the court's determination the defendant acted with deliberate cruelty, a circumstance which statutorily allowed an increased sentence.

In this case, however, neither the maximum nor minimum sentence to which Defendant was subjected was affected by the claimed error. Under La.R.S. 14:43.1, the sentencing range for each count upon which Defendant was convicted was twenty-five to ninety-nine years, with at least the first twenty-five years to be served

without benefits. Nothing changed that sentencing range, as even Defendant acknowledges "the sentencing court had this entire range in which to sentence [Defendant]." Accordingly, neither *Apprendi* nor *Blakely* have any relevance to Defendant's case. Indeed, Defendant's forty-five-year concurrent sentences are on the lower end of the trial court's sentencing authority.

Finally, Defendant makes the following claim:

> However, [Defendant] submits that the trial court's sentencing authority only extended to consideration of the facts adduced at trial or the inclusion of the *fact* of [Defendant]'s prior convictions, not the alleged facts that resulted in [Defendant]'s previous arrests or the judicial determination of what [Defendant] would have been guilty of had he elected to go to trial.

This argument ignores prior jurisprudence of this court. In *State v. Boyer*, 10-693 (La.App. 3 Cir. 2/2/11), 56 So.3d 1119, *writ denied*, 11-769 (La. 1/20/12), 78 So.3d 138, this court engaged in a lengthy recitation of factors that justified a maximum sentence on armed robbery for the defendant convicted of armed robbery with a firearm and second degree murder, including criminal charges acquired by the defendant while incarcerated and the number of times he had been disciplined while incarcerated. This court then cited *State v. Howard*, 43,227, p. 12 (La.App. 2 Cir. 6/11/08), 987 So.2d 330, 338, *writ denied*, 08-1608 (La. 4/3/09), 6 So.3d 766:

> In selecting a proper sentence, a trial judge is not limited to considering only a defendant's prior convictions but may properly review all prior criminal activity. *State v. Russell*, 40,526 (La.App. 2d Cir. 1/27/05), 920 So.2d 866, *writ denied*, 2006-0478 (La. 9/29/06), 937 So.2d 851; *State v. Jackson*, 612 So.2d 993 (La.App. 2d Cir. 1993). The sources of information relied upon by the sentencing court may include evidence usually excluded from the courtroom at the trial of guilt or innocence, *e.g.,* hearsay and arrests, as well as conviction records. *State v. Myles*, 94-0217 (La. 6/3/94), 638 So.2d 218. These matters may be considered even in the absence of proof the defendant committed the other offenses. *State v. Estes*, 42,093 (La.App. 2d Cir. 5/9/07), 956 So.2d 779. Factors to be considered may include jail disciplinary records. *State v. Russell*, *supra*.

17

Defendant provides no jurisprudential or statutory support for his claim that it was improper for the trial court to consider the circumstances leading to his prior conviction before sentencing. Likewise, Defendant provides no support for his conclusion that "As the [trial c]ourt made no specific findings that the submission of police reports and victim statements *were not* part of the [c]ourt's consideration at sentencing, this [c]ourt must construe the error in [Defendant]'s favor and vacate [Defendant]'s sentence." In light of this court's ruling in *Boyer*, Defendant's argument lacks merit.

## DECREE

Defendant's convictions and sentences are affirmed.

**CONVICTIONS AND SENTENCES AFFIRMED**.